## VIOLA M. SCHAEFER
*vs.*
## HUGO J. M. SCHAEFER

Superior Court New Haven County File No. 56673

MEMORANDUM FILED JANUARY 10, 1941.

*Chambers, Hesselmeyer & Grimes,* of New Haven, for the Plaintiff.

*Pond, Morgan & Morse,* and *Alfred E. Celentano,* of New Haven, for the Defendant.

INGLIS, J. This is an action brought by a wife against her husband for support. The husband has denied liability for support and also has filed a cross complaint asking for an adjudication of the property rights of the parties. The issues on the complaint will be discussed first.

The parties were married in Ansonia, Connecticut, on July 5, 1913. After the marriage, they lived together in various places in Connecticut until about 1919. After that they lived in New Jersey, Pennsylvania, Connecticut, Rhode Island and New York until March, 1924. At that time the defendant obtained a position with the Southern New England Telephone Company in New Haven. The parties then moved to New Haven and lived there together continuously until October 17, 1938.

In August, 1934, they had ceased to have sexual intercourse. At that time the plaintiff was 56 or 57 years old and the defendant was 47, and the cessation of sexual intercourse was strongly suggested by the plaintiff but was acquiesced in by the defendant.

The first serious quarrel between the parties occurred in September, 1935. In March of that year the defendant had been dropped from his employment in the Southern New England Telephone Company and almost immediately obtained work as a consulting engineer with the F.E.R.A. with an office in Hartford. He drove to Hartford each day for five days each week and often it was late in the evening before he reached home. On September 3, 1935, Mrs. Schaefer was told by a Mrs. McGrath that Mr. Schaefer was at the home of Mrs. Alberta C. Gesner at 101 Beers Street in New Haven, had been there frequently in the past, and was having improper relations with Mrs. Gesner and her daughter, Frances. This story was absolutely false and without any foundation but Mrs. Schaefer, without investigating it further, believed it and went to the Gesner home. There she saw Frances Gesner and accused her of improper relations with Mr. Schaefer. On that day Mr. Schaefer had been at work in Hartford all day. Upon his return in the evening his wife charged him with

having been with the Gesners during the day and told him that she had upbraided Miss Gesner. He denied the accusations and tried to prevail upon her to apologize to the Gesners. She refused to believe him and refused to apologize. The next day he went to the Gesner home himself and apologized for his wife's conduct.

Mrs. Schaefer still professes to believe that there had been something improper between Mr. Schaefer and the Gesners and although the incident did not cause a complete break between the Schaefers, it has been in the background of all of the marital difficulties they have had since. For instance, when, in 1937, Mr. Schaefer was in a slight automobile collision near Winchester's factory, Mrs. Schaefer accused him of having had a woman in the car with him. They have also had rather frequent arguments over financial matters and in these Mrs. Schaefer has often made references to the claimed affair with the Gesners.

From March, 1935, until the spring of 1938, the defendant was employed first by F.E.R.A. and then by the National Resources Commission in Hartford in making a survey of Connecticut manufacturing plants. After that work was finished, in March, 1938, he was without employment and during the summer he took a course in air conditioning in the New York Technical Institute.

After that course was completed in August, he had no employment and didn't seem to be able to find any. He and his wife had several arguments over family finances. Partly as a result of those conditions and partly because of sinus trouble and other physical conditions, he became very nervous. Accordingly, he made up his mind to go to Florida and seek employment there. He told Mrs. Schaefer of his plan and asked her to go with him. She, however, did not like warm weather and also reasoned that some one would have to stay in New Haven to manage the real estate which they owned, so she refused to go. She also was opposed to his going and tried to persuade him not to go. In spite of her arguments, Mr. Schaefer persisted in his plan and Mrs. Schaefer, seeing that there was no use in trying to dissuade him, finally acquiesced. She helped him pack and on October 17, 1938, he kissed her good-bye and started off in his car. He took with him only a relatively small portion of his clothing. After he left the home he stopped at the Union and New Haven Trust Co.,

where he took from a safety deposit box certificates for 55 shares of American Telephone and Telegraph Co. stock which stood in his name and withdrew $600 from a joint and several checking account which he and his wife had there.

When he left New Haven at that time his intention was to seek employment in Florida and, if he found it, he expected that his wife would come and join him. If he didn't find work by spring his intention was then to return to New Haven. He had no intention of abandoning his wife permanently. On the other hand, Mrs. Schaefer's expectation at that time was that her husband would return not later than the following spring. She did not anticipate that it would be a permanent separation between them and certainly did not give her express consent to a separation nor still less order her husband to leave.

Apparently, Mr. Schaefer drove to Florida in a very leisurely fashion. It was not until November 5th that he arrived in Florida. Except for a brief note to the effect that he had been slightly injured on the way down, he did not write his wife until the day after his arrival and then he did not advise her as to where he was staying but simply gave her the number of a post office box to which he could be addressed. After that, he wrote only infrequently.

In the meantime Mrs. Schaefer, without adequate reason, had come to the conclusion in her own mind that her husband had deserted her. She was suspicious that he was not really in Miami at all but probably off with another woman. She was also angry that the management of the real estate, with the attendant necessity of shoveling snow, had been left on her hands. On December 15th, in order to test her husband, she sent him a telegram at Delray, Florida, which read as follows: "Drop everything. Drive home. Urgent. Wire immediately via Western Union." To this he replied: "State nature of urgency. Will await your answer in Delray Western Union Office."

On December 29th Mrs. Schaefer wrote her husband berating him for neglecting her and threatening to move out of his house. Thereafter, she wrote several other letters charging him with having abandoned her. On January 6, 1939, he wired her from Miami that he was "sorry about the whole mess" and that she had "got me all wrong." In that wire he

also told her to take all she needed and sell property if she wished and keep property for support. He also told her he was still traveling over the state so kept his post office box in Miami and did not expect to return to New Haven until spring "unless serious."

In the meantime on January 5th, Mrs. Schaefer had discovered for the first time that her husband had taken with him the 55 shares of stock and this convinced her that her husband had abandoned her. At about this time also she heard that her husband, instead of being in Florida, was in New Haven with the Gesners. There was no foundation for this rumor but she believed it.

On January 14th and 15th she wrote bitter letters accusing him of heartlessness and complaining of the burdens he had put upon her with reference to the care of the property. Then on January 16th she tore their marriage certificate in four parts and sent it, together with her wedding ring and their house keys to him by registered mail. Her intention in doing this was to indicate to him that, so far as she was concerned, their marriage was through and he understood that that was what she meant.

She followed that with a campaign of harassment. On January 22nd, she wired him that she had reported his car as stolen. On January 23rd, she telegraphed Prof. E. R. Suavely of New York Technical Institute, upon whom Mr. Schaefer was depending for assistance in getting work, asking him what Schaefer's business association was and that "ten thousand was missing", conveying the implication that Schaefer had misappropriated $10,000 worth of property.

At about the same time she reported him as missing to the New Haven police thereby causing him embarrassment when the Miami police came to look him up. She also wrote him some more letters reproaching him for his conduct.

Finally, about the middle of February, 1939, Mr. Schaefer decided to apply for a divorce in Florida and consulted an attorney. On March 1st, the divorce action was instituted in the Circuit Court of the Eleventh Judicial Circuit of Florida, and Mrs. Schaefer was given notice of the pendency by ordinary mail. Mrs. Schaefer, through counsel, filed a special appearance and a "motion to quash order for publication" and upon May 4, 1939, and the two subsequent days a

hearing was had "upon the sole question as to whether or not on the date of the filing of the Bill of Complaint herein the plaintiff had established a legal residence in the State of Florida sufficient to give this Court jurisdiction of this cause, said testimony to be confined solely to this question and not to extend to the merits of this cause." This hearing was held before the court and the defendant in that action was present by counsel and was fully heard. Upon that hearing it was "Considered, ordered, adjudged and decreed that the plaintiff in the above styled cause, Hugo J. M. Schaefer is now and had been at the time of the filing of the Bill of Complaint in this cause on March first, 1939, an actual and bona fide resident of Miami, Dade County, Florida, for more than ninety days immediately preceding the filing of said bill on March first, 1939, and has been a continuous, actual and bona fide resident of Miami, Dade County, Florida since the 5th day of November, 1938."

After this hearing on the question of jurisdiction, Mrs. Schaefer did not further contest the divorce or in any way participate in the proceedings. The case was referred to a special master to find the facts. After hearing he found that the defendant in that action had been "guilty of (a) extreme cruelty of the defendant to the plaintiff. (b) Wilful, obstinate and continued desertion of the plaintiff by the defendant for more than one year." Upon the report of the special master, a final decree of divorce *a vinculo matrimonii* was entered on August 15, 1939.

When the defendant left New Haven on October 17, 1938, he left the following property available for his wife's support: a joint and several deposit in the Union and New Haven Trust Co., commercial department, amounting to $756.59, joint and several deposits in The Industrial Trust Co. of Providence, in The Bowery Savings Bank of New York, and in The Fidelity Union Trust Co. of Newark, N. J., totaling about $575. These accounts she had transferred into her own name individually by February, 1939. He also left her in charge (with power of attorney) of his real estate located at 128 Howe Street, New Haven. This produced a gross rental of $116 per month which she collected until a receiver was appointed in this action on September 22, 1939. From October 17, 1938 to February 28, 1939, the net rentals collected amounted to only $133.80 because taxes amounting to $326.15 were paid

but from then on at least to the date of the divorce the plaintiff received the gross rentals without having to pay any very considerable carrying charges.

The sum total of these resources was more than adequate to provide reasonable support for the plaintiff at all times between October 17, 1938 and August 15, 1939, and the defendant had fully authorized her to use so much of those resources as were reasonably necessary for that purpose.

On the foregoing facts and the other evidence in the case the following conclusions relative to the issues on the complaint have been reached.

The defendant never abandoned the plaintiff. To consti tute abandonment of a wife by her husband it must appear that he has voluntarily and without justification left his wife with an intent either existing at the time he left or formed afterwards not to return to her and not to resume his marital duties to her. *Kantor vs. Bloom,* 90 Conn. 210; *Moore vs. Stevenson,* 27 id. 14, 25. It is clear that the defendant never formed such an intent until after the plaintiff herself had broken off marital relations by sending him the torn wedding certificate and wedding ring and by her conduct which justi-fied the defendant in not continuing marital relations. The cessation of marital relations was because of the fault of the wife and without any substantial fault on the part of the hus-band. The abandonment in this case, therefore, was of the husband by the wife rather than of the wife by the husband.

A husband is not bound to provide for the support of a wife who has abandoned him. *State vs. Newman,* 91 Conn. 6, 9; *Alexander vs. Alexander,* 107 id. 101, 108. Accordingly, in this case there is no liability on the defendant to support the plaintiff.

Irrespective of the matter of abandonment the defendant provided adequate support for the plaintiff down to the time that the divorce decree was entered, and the divorce if valid relieves him from all further obligation for her support. In order that the Florida divorce be valid to affect the marriage status of the wife and deprive her of her right of support by her husband, it must appear that the Florida court had juris-diction of the divorce action so that its decree is entitled to full faith and credit. There are two elements which are es-sential to that jurisdiction. It must appear first that the resi-

dence and domicil of the plaintiff in that action had been in Florida for the statutory period so that the court had jurisdiction of the domicil of that plaintiff. In the second place it must appear that the Florida court had jurisdiction of the marital domicil of the parties. *Haddock vs. Haddock*, 201 U.S. 562, 50 L. ed. 867.

So far as the personal domicil of the plaintiff in a divorce action in one state where the defendant is a resident of another state is concerned, it is well settled that if the defendant has not appeared in the divorce action, that question may be reexamined in any action in which the validity of the divorce decree is attacked. If it should be found that the plaintiff's domicil as a matter of fact had not been within the jurisdiction of the court granting the divorce, then of course it follows that the court granting the decree was without jurisdiction and the decree is not entitled to full faith and credit. *Mills vs. Mills*, 119 Conn. 612.

If such question were open to reexamination in this ·case it would have to be found that Mr. Schaefer's domicil was not in Florida for 90 days prior to March 1, 1939. He, of course, had been staying in Florida since November 5, 1938, but he had no present intention during that period of making Florida his home. His intention during that period was to return to Connecticut in the spring of 1939, unless in the meantime he found permanent employment n Florida. He did not succeed in obtaining such permanent employment. Such an intention does not form the basis for the establishment of a domicil.

However, the fact that the Florida court had jurisdiction of Mr. Schaefer's domicil is not now open to attack. That is because Mrs. Schaefer entered her appearance specially in the Florida action to contest the jurisdiction of the Florida court on the ground that Mr. Schaefer had not established a legal residence in Florida sufficient to give the court jurisdiction, was fully heard on that claim, and the Florida court found that the plaintiff in that action had been such a resident and adjudged that it had jurisdiction of the subject matter of the action.

It has long been established that a party appearing and participating in proceedings in a court of any state will be precluded from questioning the jurisdiction of the court *over his*

*person* in any subsequent proceeding if the court in which he appeared purported to render judgment against him. This is true even though he only appeared specially to contest the jurisdiction. *Restatement, Conflict of Laws,* §451; Anno. 52 A.L.R. 740. Until recently there has been a question as to whether this rule extended to questions of jurisdiction of the subject matter of litigation. For instance, the *Restatement,* published in 1934, contains a caveat on this subject. In connection with the statement of the rule concerning jurisdiction of the person of a litigant, it says: "The Institute expresses no opinion whether and how far a party appearing and participating in the proceedings in a court of any state is precluded from subsequently questioning the jurisdiction of the court over the subject matter of the action in the courts of that state or any other state if the court in which he appeared purported to render a judgment against him."

The Supreme Court of the United States, however, has now decided the question. In *Davis vs. Davis,* 305 U.S. 32, 83 L. ed. 26, 118 A.L.R. 1518, it appeared that the husband, having obtained a divorce *a mensa et thoro* from his wife in the District of Columbia, went into Virginia and after he had remained there for the statutory period sued for a divorce *a vinculo matrimonii*. The wife, who had continued her residence in the District of Columbia, entered the action specially for the sole purpose of contesting the jurisdiction of the Virginia court on the ground that the husband was not a *bona fide* resident of that state. After a full hearing, the Virginia court decided against her, found that the husband was a *bona fide* resident of Virginia and held that it had jurisdiction. Later it granted the divorce. The husband some years later came into the District of Columbia court and asked for a modification of the order for support which had been entered against him in the divorce *a mensa et thoro,* setting up the Virginia divorce. The Supreme Court, reversing the Court of Appeals for the District of Columbia, held that, having submitted to the Virginia court the question of her husband's domicil, the wife was concluded by the judgment of that court on the subject. It was *res judicata* against her and she could not again litigate that matter in the courts of another jurisdiction. The court, by Mr. Justice Butler, said in part (p. 40 of vol. 305 U.S.): "As to petitioner's domicil for divorce and his standing to invoke jurisdiction of the Virginia court, its finding that he was a bona fide resident of that State for the required

time is binding upon respondent in the courts of the District. She may not say that he was not entitled to sue for divorce in the state court, for she appeared there and by plea put in issue his allegation as to domicil, introduced evidence to show it false, took exceptions to the commissioner's report, and sought to have the court sustain them and uphold her plea. Plainly, the determination of the decree upon that point is effective for all purposes in this litigation." The court therefore held that the Virginia decree was entitled to full faith and credit in the courts of the District of Columbia.

It is true that, later on in the opinion, the Supreme Court also comes to the conclusion that the wife had entered the action to contest the merits of the divorce, but the discussion of that point is separated from and has no bearing on its conclusion that the wife was concluded by the finding that the husband was a *bona fide* resident of Virginia. It rather is in connection with the discussion of the question as to whether the Virginia court had jurisdiction of the marital domicil. And it is perfectly clear that the court holds that the wife was concluded by the finding as to the husband's domicil because she had submitted that question to the Virginia court even though she did it only on a special appearance irrespective of whether she later appeared generally.

This determination of the law having to do as it does with the question of full faith and credit under the United States Constitution is binding and conclusive on all courts. In the present case, therefore, it must be held that Mrs. Schaefer, having submitted to the Florida court on her motion to quash in the nature of a plea to the jurisdiction the question of her husband's domicil and residence, even though she did it only on a special appearance, is now bound by the decision of the Florida court on that subject matter. This court must give full faith and credit to the judgment of the Florida court on that question.

The next question is as to whether the Florida court had jurisdiction of the marital domicil. This question, except so far as it involves the question of the personal domicil of the husband, was not submitted to the Florida court.

Section 113 of the American Law Institute's Restatement on conflict of laws, lays down the law as follows:

"A state can exercise through its courts jurisdiction to dis-

solve the marriage of spouses of whom one is domiciled within the state and the other is domiciled outside the state, if

 (a) the spouse who is not domiciled in the state
 (i) has consented that the other spouse acquire a separate home; or
 (ii) by his or her misconduct has ceased to have the right to object to the acquisition of such separate home; or
 (iii) is personally subject to the jurisdiction of the state which grants the divorce; or
 (b) the state is the last state in which the spouses were domiciled together as man and wife."

It is clear that the present case falls within both a(i) and a(ii) of this statement of the law. By signifying to her husband by sending him the torn marriage certificate and the wedding ring that their marital relations were terminated she had consented to his acquiring a separate home. Also by her misconduct which, as herein above found, constituted abandonment of him she had ceased to have the right to object to the acquisition by him of a separate home. This had all occurred before he instituted his action for a divorce.

It is, therefore concluded that, it now being *res judicata* between the parties that the Florida court had jurisdiction of the domicil of Mr. Schaefer, and it being found that it also had jurisdiction of the marital domicil, the judgment of divorce entered therein is valid, conclusive as to the marriage status of both of the parties and entitled to full faith and credit in this state. It, therefore, follows that the plaintiff in this action had no right to receive support from the defendant from and after the date of the decree. Accordingly, the issues on the complaint are found in favor of the defendant.

Upon the amended cross complaint it appears that, at the time Mr. Schaefer left for Florida, the parties owned either individually or jointly or jointly and severally the following property:

 (1) Real estate consisting of land and several buildings, located at 128-128½ Howe Street, New Haven, standing in the name of Mr. Schaefer.
 (2) Real estate consisting of land at 17 Templeton Street, West Haven, standing in the names of both parties jointly.

(3) An undivided one-half interest in real estate consisting of land and three houses at 393-395 Elm Street, New Haven, standing in the name of Mrs. Schaefer.

(4) An undivided one-half interest in real estate located on Ocean Avenue, West Haven, standing in the name of Mrs. Schaefer.
(The other undivided one-half interest in items 3 and 4 stands in the name of Mrs. Schaefer's brother, Leslie Jenks.)

(5) 190 shares of the stock of The American Telephone and Telegraph Co., the certificates for which stood in the name of Mrs. Schaefer but had been endorsed in blank by her.

(6) 55 shares of the stock of The American Telephone and Telegraph Co., certificates for which stood in the name of Mr. Schaefer.

(7) A deposit in the Industrial Trust Co. of Providence, R. I., with a balance of $53.91 standing in the names of both parties "and payable to either, or survivor of them."

(8) A deposit in the Bowery Savings Bank of New York with a balance of $323 standing in the names of both parties and payable to either of them.

(9) A deposit in the Fidelity Union Trust Bank, Newark, N. J., with a balance of $199 standing in the names of both parties and payable to either of them.

(10) A deposit in the commercial department of the Union & New Haven Trust Co., with a balance of $756.59, standing in the names of both parties and subject to withdrawal by check by either.

The broad claim of the defendant as regards all of the property is that there existed a verbal contract between him and his wife that there should be a partnership between them and that all property that came into the possession of either during their marriage should be the so-called community property of both and that each should own an undivided one-half interest therein. The evidence does not justify a finding that there was any such general express agreement between them.

There does not appear to have been any agreement of any sort with reference to the real estate. The property on Howe Street was purchased in 1916 by the defendant with savings from his earnings. Title was taken in his name. There was no other agreement as to the title and, if there had been a

verbal agreement it would have been unenforceable because of the statute of frauds. There were no acts of the plaintiff which were referable to the claimed contract and which as part performance would take the contract out of the statute. It is therefore found that title to that property is in the defendant free of any claims on the part of the plaintiff.

In the same way there was no contract relating to the Templeton Street property. That property was purchased with funds of the defendant. Title was taken by him in his and Mrs. Schaefer's name jointly. It is to be presumed and is found that the defendant intended to give his wife an undivided one-half interest in that property and it is therefore concluded that the parties now own that property jointly, an undivided one-half interest being in each.

The Elm Street property was deeded to the plaintiff and her brother subject to a life use in their father, Fred E. Jenks, who died in 1929. That conveyance was made in 1901, long before the plaintiff and defendant were married. As before stated, there never was any contract between the parties relating to that property. It is therefore concluded the plaintiff is the owner of her undivided one-half interest in that property free from all claims on the part of the defendant.

The half interest in the Ocean Avenue property was deeded to the plaintiff by her brother without her paying any consideration for it. Certainly no funds of the defendant went into the purchase of the property. It is therefore found that that undivided half interest is the property of the plaintiff and that the defendant has no right to it.

So far as the personal property listed above is concerned, it appears that it has been the practice of the parties during their married life to deposit such of the earnings of the husband as could be saved by the frugality of the wife in joint and several bank accounts. In addition to the joint and several savings deposits listed as items 7, 8 and 9 above they have in times past had joint and several savings deposits in The Union & New Haven Trust Co., The New Haven Savings Bank, The National Tradesman's Bank and Trust Co., and The Connecticut Savings Bank. All of these deposits were made in the names of both and were "payable to either of them or the survivor." These accounts were all closed prior to October 17, 1938. In addition to the savings accounts, on February 13,

1934, the parties opened a checking account at The Union &
New Haven Trust Co., in the names of "Hugo J. M. or Viola
M. Schaefer." This account was not closed until January 16,
1939. The deposits in this checking account, except for cer-
tain trust funds hereinafter referred to, were made exclusively
from the earnings of the defendant, the income from his real
estate, withdrawals from the joint and several savings accounts
and dividends received on the stock of The American Tele-
phone and Telegraph Co., listed as items 5 and 6 above.
None of the income from Mrs. Schaefer's interests in real
estate ever went into this account.

The various purchases of the shares of stock of The Ameri-
can Telephone and Telegraph Co. were made as follows:

| | No. of Shares | | |
| Date | Item No. 5 | At | Total cost |
| --- | --- | --- | --- |
| Dec. 12, 1930 | 75 | $180 | $13,518.75 |
| Dec. 15, 1930 | 10 | 180 | 1,803.00 |
| Dec. 17, 1930 | 10 | 178 | 1,783.00 |
| Nov. 18, 1931 | 7 | 140 | 983.00 |
| May 26, 1932 | 37 | 94 | 3,485.40 |
| Aug. 1, 1934 | 10 | | 1,083.90 |
| Nov. 20, 1934 | 10 | | 1,052.65 |
| Nov. 20, 1934 | 10 | | 1,083.90 |
| March 20, 1935 | 21 | | 2,130.77 |
| Total | 190 | | |
| | Item No. 6 | | |
| Jan. 6, 1938 | 15 | | 2,152.18 |
| Feb. 7, 1938 | 40 | | 5,560.00 |
| Total | 55 | | |

Of the amounts paid for these various stock purchases, all
were paid out of the joint checking account at the Union &
New Haven Trust Co. except the $983 paid Nov. 18, 1931,
which came directly from a payment made to the defendant
by The Southern New England Telephone Co. and the $5,560
paid February 7, 1938, of which $1,199.20 came from The
Union & New Haven Trust Co. account, about $3,700 came
from the joint and several deposit in The Bowery Savings
Bank and the balance of about $860 is not traceable.

In making all of the joint and several deposits and in pur-
chasing the shares of stock of the American Telephone and

Telegraph Co., it was the tacit and indeed often expressed intention of the parties to accumulate a fund to be used for their joint family purposes. In making various of the savings bank accounts payable to the survivor, it was not the intention of the parties to give the survivor any estate or additional interest in the deposits other than what he or she might take as distributee of the estate of the first to die. The purpose was simply to facilitate the distribution of such estate. The situation, therefore, in so far as the accumulation of their own funds is concerned, is that by a combination of the efforts of both of them a fund has been accumulated with the intention that it should belong to them jointly and be used for the purposes of the family. In other words, they have been engaged in a joint enterprise in the nature of a joint adventure. The proceeds of the joint adventure belong to them jointly and now that the purpose of the enterprise, namely, the accumulation of a fund for the use of the family, is now frustrated by the dissolution of the family, equity will divide all of the fund, which belongs to the parties jointly, equally between them. And equity will not be hampered in making that division simply because some of the stock certificates stand in the name of one party alone and others in the name of the other. In so far as these stock certificates were purchased by the joint funds of the parties which were the assets of the joint adventure, it is clear that the parties intended that the shares of stock should constitute a part of the joint fund. Accordingly, the record ownership of the stock is impressed with a resulting trust and the stock is to be treated as a part of the fund irrespective of the record ownership. *Dolan vs. Dolan,* 107 Conn. 342.

A difficulty arises by reason of the fact that the plaintiff has commingled trust funds with the joint funds and those trust funds have gone into the purchase of some of the stock.

Briefly, the history of those trust funds is as follows: The plaintiff's father, Fred E. Jenks, prior to 1927, had opened savings accounts as follows: in the Union & New Haven Trust Co., an account entitled "Frederick Edward Jenks, Fred E. Jenks, Trustee", an account entitled "Sarah Elizabeth Jenks, Fred E. Jenks, Trustee" and an account entitled "Dorothy Edwards Jenks, Fred E. Jenks, Trustee"; in The New Haven Savings Bank, an account entitled "Fred E. Jenks, Trustee for Grace Louise Jenks", an account entitled "Fred E. Jenks,

Trustee for Sara Elizabeth Jenks", an account entitled "Fred E. Jenks, Trustee for Frederick Edward Jenks, 2nd.", and an account entitled "Fred E. Jenks, Trustee for Dorothy Edwards Jenks"; and in The Connecticut Savings Bank, an account entitled "Grace Louise Jenks, Fred E. Jenks, Trustee", an account entitled "Sara Elizabeth Jenks, Fred E. Jenks, Trustee", an account entitled "Dorothy Edwards Jenks, Fred E. Jenks, Trustee" and an account entitled "Fred Edwards Jenks, 2nd., Fred E. Jenks, Trustee." The beneficiaries named in these various accounts were the grandchildren of Fred E. Jenks and he intended to establish these various accounts as trust funds for them respectively.

In 1927, the plaintiff was substituted as trustee in the place of Fred E. Jenks on all of these accounts. In December, 1929, Fred E. Jenks died.

Between April 26 and May 10, 1930, the plaintiff closed all of the above accounts in The Union & New Haven Trust Co. by withdrawing from the Sara Elizabeth Jenks account a total of $651.71, from the Frederick Edwards Jenks account, a total of $651.71 and from the Dorothy E. Jenks account a total of $626.21, a grand total of $1,929.63. This money she deposited on May 3rd and May 10th in the joint and several account of her and her husband in The National Tradesmen's Bank. From there, on December 11, 1930, it, together with enough more so that the total was $4,000, was withdrawn and deposited in the plaintiff's and defendant's checking account in The Union & New Haven Trust Co., and from there it was used in part payment for the first purchase of the American Telephone and Telegraph Co. stock.

On May 29, 1930, the plaintiff closed all of the trust accounts in the New Haven Savings Bank by transferring the balance, which was $895.93 in each of the four accounts, a total of $3,583.72, to the joint and several savings account in her and her husband's name in the same bank. That sum was included in the sum of $8,000 which she withdrew from her and her husband's joint and several account on December 11th, which amount she deposited in their joint checking account and used in part payment for the first block of stock of The American Telephone and Telegraph Co.

On April 15, 1930, she closed all of the trust accounts in the Connecticut Savings Bank by transferring the balances to

the joint and several savings account of her and her husband in that bank. The amounts so transferred were, from the Grace Louise Jenks account $836.70, from the Sara E. Jenks account $839.16, from the Dorothy E. Jenks account $488.95 and from the Frederick E. Jenks account $842.88, a total of $3,007.69. This sum went to make up the $1,500 withdrawn on December 11, 1930, which was deposited in the joint checking account and was used to pay for the first block of stock bought and $1,500 which she drew on December 15, 1930, and which was used to pay in part for the second block of stock bought and the $1,700 which she drew on December 17, 1930, and which was used to pay for the third block of stock.

It, therefore, appears that all of those trust funds, totaling $8,521.04, can be traced into the stock of The American Telephone and Telegraph Co. which now stands in the name of Mrs. Schaefer, but the certificates for which are endorsed in blank by her. It does not appear that any other trust funds or any funds except the savings of Mr. and Mrs. Schaefer from his earnings, from the income from his real estate, from the dividends or interest received by them on their joint and several bank accounts and from the dividends paid on the American Telephone and Telegraph Co. stock have gone into the purchase of the stock. Accordingly, it is clear that the first things to be done is for the trust funds to be reimbursed out of the proceeds of the joint fund now held by the parties. This should be done by setting aside from the joint fund separate trust funds for the benefit of each of the plaintiff's nieces and nephew, sums equal to the amount which Mrs. Schaefer withdrew from their respective accounts plus interest thereon at the rate of four per centum per annum compounded semi-annually.

It also appears that since the separation of the parties on October 17, 1938, each has used some portion of the joint fund for living and other expenses. Certainly a portion of that used by Mrs. Schaefer she was entitled to use for her support down to the date of the divorce. It will be necessary to take an account from Mrs. Schaefer in order to determine how much she has collected net, in rentals from her husband's real estate since October 17, 1938, which together with the net collections made by the receiver of rents should be added to the fund, and also to determine how much her reasonable support

down to August 15, 1939, amounted to, which amount will be properly deductible from the fund. It will also be necessary to take an account from Mr. Schaefer as to his disposition of such of the joint fund as has been in his control since October 17, 1938. In this account he should be credited with reasonable living expenses which he paid out of that fund. After such accounts are taken the principal of the joint fund as of August 15, 1939, will be ascertained. From that, should be deducted the amounts necessary to reimburse the trusts and the balance should· be apportioned between the parties equally share and share alike.

At this time a judgment may enter for the defendant on the complaint and that he recover his taxable costs of the plaintiff.

On the cross complaint an interlocutory judgment may enter directing that the parties account to each other along the lines outlined in this memorandum of decision. Said accounting shall be had before the court unless the parties stipulate that it be referred to a State Referee. After the accounting is had and settled further proceedings may be had looking to a final distribution of the stock or the proceeds of the sale of the stock of The American Telephone and Telegraph Co., which is now held or was held on October 17, 1938, in the names of either or both of the parties and such other assets as form a part of the joint fund accumulated by the parties.